**FIRST ROUMANIAN AMERICAN CONGREGATION, Plaintiff,**

v.

**GUIDEONE MUTUAL INSURANCE COMPANY, Defendants.**

**No. 11 Civ. 1467 (NRB).**

United States District Court,
S.D. New York.

March 9, 2012.

Oleg Rivkin, Esq., V. David Rivkin, Esq., Fox Horan & Camerini LLP, New York, NY, for Plaintiff.

Leonard F. Lesser, Esq., Renee Simon Lesser, Esq., Simon Lesser PC, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

### I. Introduction

First Roumanian American Congregation (the "plaintiff") brings suit against GuideOne Mutual Insurance Company (the "defendant") seeking a declaratory judgment and damages in connection with the alleged breach of the terms of an insurance policy. Before the Court is defendant's motion to dismiss plaintiff's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated below, defendant's motion is granted in part and denied in part.

### II. Background [1]

Plaintiff is a religious organization with longstanding ties to a synagogue that was

1. Unless otherwise noted, the facts recited here are drawn from the amended complaint

located at 89 Rivington Street, New York, New York 10002. Am. Compl. 1; Am. Compl. Ex. A 2. Defendant is a corporation with its principle place of business in West Des Moines, Iowa that specializes in providing insurance to religious organizations. Am. Compl. ¶¶ 2–3. Prior to the events giving rise to this suit, plaintiff had "[f]or a period of years" purchased building and personal property insurance from defendant to cover losses at its synagogue. Am. Compl. 1. In an annual renewal certificate, dated July 18, 2005, defendant extended the insurance policy (the "policy") for plaintiff's synagogue to cover the period from September 1, 2005 to September 1, 2006. Am. Compl. Ex. A 3.

### A. The Insured Loss

On January 22, 2006, the roof of plaintiff's synagogue collapsed. Am. Compl. ¶ 11. Following the collapse, the City of New York ordered the demolition of the remaining unstable structure, which was razed in March 2006. *Id.* at ¶¶ 12–13. Given the synagogue's condition, plaintiff was only permitted to remove two items of particular religious significance from the ruins prior to the demolition. *Id.* at ¶ 14. "[V]irtually all other objects that were in the synagogue at the time of collapse" "were either destroyed or rendered irrecoverable by the collapse." *Id.* at ¶ 15.

### B. The Insurance Policy

Pursuant to the Commercial Property Coverage Part of the policy, plaintiff held insurance coverage for up to $1,211,000 on the synagogue and for up to $218,100 on personal property located in the synagogue, subject in each case to a deductible of $500. *See* Am. Compl. Ex. A 18. The Building and Personal Property Coverage Form (the "coverage form") detailed the

property covered by this insurance coverage as well as the obligations of plaintiff and defendant in the event of covered loss or damage. *See id.* at 33–55.

In § E(4)(a)(1) and (2), the coverage form addresses defendant's salient obligation to pay plaintiff in the event of covered loss or damage, providing in relevant part, "at [defendant's] option, [defendant] will either: (1) [p]ay the value of lost or damaged property [or] (2) [p]ay the cost of repairing or replacing the lost or damaged property." *Id.* at 48. A number of provisions in the coverage form dictate when defendant's obligation to pay is triggered as well as how covered loss or damage is valued and also how much defendant must ultimately pay plaintiff. As a baseline, § E(7)(a) of the coverage form states that "the value of [c]overed [p]roperty" will be determined at replacement cost. *Id.* at 50. However, pursuant to § E(7)(d)(1) and (2), "[defendant] will not pay on a replacement cost basis for any loss or damage: (1) [u]ntil the lost or damaged property is actually repaired or replaced; and (2) [u]nless the repairs or replacement are made as soon as reasonably possible after the loss or damage." *Id.* Further, in § E(7)(e), the coverage form specifies, "[defendant] will not pay more for loss or damage on a replacement cost basis than the least" of (i) the applicable insurance limit, (ii) "[t]he cost to replace, on the same premises, the lost or damaged property with other property . . . [o]f comparable material and quality[ ] and . . . [u]sed for the same purpose," or (iii) the amount plaintiff actually spends on replacement. *Id.*

Like defendant, plaintiff too has certain responsibilities in the event of covered loss

---

("Am.Compl."), the exhibit to the amended complaint ("Am. Compl. Ex. A"), and documents quoted or referenced in the amended complaint and provided by plaintiff's counsel

in supplemental exhibits on January 26, 2012 pursuant to the Court's request ("Supp. Ex. [ ]").

or damage. For instance, pursuant to § E(3)(a)(2) of the coverage form, the plaintiff must "[g]ive [defendant] prompt notice of the loss or damage" and "[i]nclude a description of the property involved." *Id.* at 43. In addition, pursuant to § E(3)(a)(7), the plaintiff must "[s]end [defendant] a signed, sworn proof of loss containing the information [defendant] request[s] to investigate the claim." *Id.* Plaintiff must provide this information within sixty (60) days of defendant's request, and defendant must supply plaintiff with the necessary forms. *Id.*

While actual repair or replacement is a condition precedent to defendant's payment on a replacement cost basis, the coverage form also provides in § E(7)(c) that "[plaintiff] may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis," in which case "[plaintiff] may still make a claim for the additional coverage that replacement cost coverage provides if [plaintiff] notif[ies] [defendant] of [its] intent to do so within 180 days after the loss or damage." *Id.* at 50. The term actual cash value is separately defined in § G(3) of the coverage form:

> Actual Cash Value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration or depreciation however caused.... The Actual Cash Value of the lost or damaged property may be

significantly less than its replacement cost.

*Id.* at 53.

Regardless of whether replacement cost or actual cash value is used as the basis for valuing the covered property, the coverage form provides in § E(2) for an appraisal process should "[defendant] and [plaintiff] disagree on the value of the property or the amount of loss." *Id.* at 48. Pursuant to ·this appraisal process, "either [defendant or plaintiff] may make written demand for an appraisal," in which event the parties will each select an appraiser, the two appraisers will either select an umpire or failing an agreement between them defer to a court's selection, and a decision endorsed, by any two members of the resulting panel will be binding. *Id.* Pursuant to the coverage form, the parties would each be responsible for paying their chosen appraiser and would split the remaining appraisal costs. *See id.*

### C. The Insurance Claims

On January 23, 2006, the day following the collapse of the synagogue's roof, plaintiff reported its loss to defendant, initiating the set of insurance claims that underlie this suit. Am. Compl. ¶ 16. The parties do not appear to have ever disputed that the roof's collapse is a covered cause of loss. *See* Am. Compl. Ex. A 56–65 (Causes of Loss Form). While there appears to have developed some disagreement over whether all of the personal property loss is covered loss,[2] the parties similarly do not appear to have ever dis-

---

2. In moving to dismiss plaintiff's amended complaint, defendant has not pressed the contention that damage or loss to personal property in the synagogue resulted from a cause other than the roof's collapse (*i.e.* the subsequent and municipally-ordered demolition). *But see* Decl. of Renee Simon Lesser, Esq. in Supp. of Def.'s Mot. to Dismiss Pl.'s Compl. ("First Lesser Decl.") Ex. H 5 ("any and all personal property damaged as a result of the

City's order to demolish the building and not as a direct result of the roof collapse is excluded from coverage"). We note that plaintiff vigorously contests the proposition "that the personal property was not damaged as a direct result of the building['s] collapse" and finds defendant's possibly contrary position "baseless[] and made in bad faith." Am. Compl. ¶ 60.

puted that the synagogue's demolition following the roof's collapse is a covered loss.

### 1. The Building Insurance Claim

In March 2006, defendant paid plaintiff $250,000 pursuant to § A(4)(e) of the coverage form, which provides for additional insurance payments to plaintiff for expenses related to compliance with any ordinance or law, including the expenses associated in this case with demolishing and clearing from the premises covered property pursuant to the direction of the City of the New York. Am. Compl. ¶ 17; Am. Compl. Ex. A 37. In July 2006, defendant paid plaintiff a further $350,000 in connection with these same expenses, which amount represented the remainder available under the policy. Am. Compl. ¶¶ 18–19.

On November 22, 2006, Norde Battle ("Battle"), a senior claims specialist employed by defendant, wrote to plaintiff's counsel at the time, Bob Mercurio ("Mercurio"), and advised:

As you are aware, your policy has been endorsed to provide replacement cost coverage. However, the endorsement states that the insurance company initially will only pay you the actual cash value (ACV) of the building[ ] until it is replaced. ACV is the replacement cost of an item less depreciation. The depreciation is calculated based on age and/or condition of the building. The difference between the depreciated cost and the actual replacement cost will be paid upon receipt of acceptable documents

confirming the repair or replacement of the building.

The Replacement Cost of your claim is $1,823,023.00 [and] applicable depreciation is $1,217,381.16, resulting in a net payment in the amount of $605,641.84. Be advised your recoverable depreciation is $605,358.16. Your ACV check will arrive under separate cover.

Supp. Ex. 1.[3] *See also* Am. Compl. ¶¶ 20–24. As plaintiff acknowledges, defendant indeed paid plaintiff $605,641.84 but withheld $605,358.16 in recoverable depreciation or "hold back" as the parties refer to it. Am. Compl. ¶ 25.

In its amended complaint, however, plaintiff asserts that defendant's original estimate of the synagogue's replacement cost, which defendant provided to plaintiff on August 11, 2006, was not $1,823,023.00 but instead $6,030,568.34. *See* Am. Compl. ¶ 27; Decl. of Gershon Spiegel in Supp. of Pl.'s Opp'n to Def.'s Mot. to Dismiss ("First Spiegel Decl.") Ex. B (purporting to reflect defendant's original replacement cost estimate); Decl. of Gershon Spiegel in Further Supp. of Pl.'s Opp'n to Def.'s Mot. to Dismiss ("Second Spiegel Decl.") ¶ 3 (describing meeting at which original estimate was provided). Plaintiff asserts that while the original estimate is "well within the range of construction cost in New York," the subsequent estimate on which defendant premised its actual-cash-value payment and hold back is "a wholly unrealistic number." Am. Compl. ¶¶ 27–28. Further, plaintiff contends that had defendant

---

3. Though not expressly stated in the amended complaint, it does not appear that the parties dispute that plaintiff requested that defendant pay plaintiff the actual cash value of the loss to the building pending the rebuilding of the synagogue pursuant to § E(7)(c) of the coverage form. *See* First Lesser Decl. Ex. H ("[p]ursuant to the policy's provisions [defendant] elected to settle the claim for actual cash value of the property, which was paid on or about November 22, 2006"). While it is nowhere suggested explicitly that defendant simultaneously or subsequently informed defendant that it intended to seek the additional coverage that replacement cost coverage provides within 180 days of the loss, as § E(7)(c) requires, the parties similarly do not appear to dispute that plaintiff complied with this policy requirement, which we accordingly assume was fulfilled.

used the "proper" original estimate, there would have been no basis for any hold back because even with depreciation the actual cash value of the synagogue would have exceeded the applicable insurance limit of $1,211,000. *Id.* at ¶ 29.

Despite contemporaneous awareness in November 2006 of both the original estimate and the subsequent estimate, plaintiff contends that "[w]hen [it] received [defendant's] ACV check, rather than getting into an argument over the method by which the ACV was calculated, [it] proceed[ed] in good faith to discuss with [defendant] what [ ] it needed to do to receive the 'hold back.' " *Id.* at ¶ 30. By way of further explanation, plaintiff adds, "[t]o the extent possible, [it] wished to avoid friction and animosity, and it assumed the same good faith on the part of [defendant]." *Id.*

On December 18, 2006, plaintiff's efforts to seek guidance from defendant regarding the hold back apparently began in an email from Mercurio to Battle in which Mercurio initially conveyed, "I want to avoid later problems by addressing now the question of the replacement cost to which [plaintiff] will be entitled upon replacement of the synagogue." Supp. Ex. 2. *See also* Am. Compl. ¶ 31. After paraphrasing § E(7)(e) of the coverage form, Mercurio asserted that "[p]lans for reconstruction are now being considered" and that "[o]ne such plan" involved the transfer of plaintiff's premises to a developer, which would permit plaintiff to use space in a mixed-use structure for a synagogue and continue to offer its congregants "the same, and possibly expanded, services." Supp. Ex. 2. As Mercurio explained, "[i]t is not yet clear what the balance of the structure will be used for, nor are the construction materials identified," though he acknowledged it was unlikely that the new structure would be built using the same methods as the old structure. *Id.* After asserting that the

construction costs would exceed the hold back, Mercurio inquired, "Is there anything in this scenario that raises any issue for [defendant] insofar as payment of the replacement cost ... is concerned?" *Id.* Explaining that plaintiff wished to remain on its same premises but that he did "not want any part of th[e] cost [associated with remaining] to be some diminution in the insurance recovery [plaintiff] is counting on," Mercurio closed his email by further explaining that "[plaintiff] need[s] to move quickly with the development issues now being considered." *Id.* After not receiving a response, on January 17, 2007, Mercurio apparently forwarded his prior email to Battle, explaining "[plaintiff] is working towards an agreement along the lines suggested ... but cannot finalize matters until we hear from you." Supp. Ex. 3. *See also* Am. Compl. ¶ 33.

On January 18, 2007, the following day, Battle responded to Mercurio's emails in a letter, explaining, "[u]nfortunately, [defendant] is not in a position to provide you an answer to the above question for several reasons." Supp. Ex. 4. *See also* Am. Compl. ¶ 34. Providing an explanation for one of these reasons, Battle stated, "you have not provided [defendant] with any specific information that would enable it to lay next to the policy of insurance to make a coverage determination on the insured's future entitlement to additional proceeds." Supp. Ex. 4. Explaining that other provisions in addition to § E(7)(e) bore on the question, Battle continued, "[w]hen and if you have definitive construction blueprints in detail concerning the proposed replacement structure for the site of the insured property as well as building permits, we would be happy to consider that information in connection with a replacement cost holdback claim." *Id.*

On February 12, 2007, Mercurio responded to Battle with a further email in

which he initially stated, "I recognize, of course, that you are not in a position to commit [defendant] to any particular claim resolution before all the relevant facts are known" before proceeding to nonetheless insist, "I do not understand why [defendant] cannot answer the simple question I intended to ask." Supp. Ex. 5. *See also* Am. Compl. ¶ 36. That "simple question," according to Mercurio, was whether defendant regarded the fact "that the synagogue will not be a stand-alone structure ... as something that would [alone] disqualify [plaintiff] from receipt of any part of the replacement cost holdback." Supp. Ex. 5. Acknowledging that "[plaintiff] understand[s] that other factors will enter the determination of the amount ultimately to be paid, if anything," Mercurio asserted that "[plaintiff] is certainly entitled to ... an interpretation of the policy as it relates to this one issue." *Id.*

A little over an hour later. Battle responded to Mercurio's email by inquiring whether "there [are] plans available for what they have intentions of building at this time" and explaining again that "it may help if [defendant] review[s] [such plans]." Supp. Ex. 6. *See also* Am. Compl. ¶ 37. Battle, concluded his brief response by conveying, "the building needs to be of like kind and quality. IF the majority of the building was a synagogue, then the replacement would need to be very close to the same thing, back to like kind and quality." Supp. Ex. 6.

On February 15, 2007, a few days later, Mercurio wrote a final email to Battle, in which he stated, "[t]he plans are not available and, because they will not be created until after the relationship between [plaintiff] and the developer has been structured, [plaintiff] won't be able to get you something to review until the die is cast." Supp. Ex. 7. *See also* Am. Compl. 33. After suggesting that he interpreted that

the rebuilt synagogue would be of like kind and quality, as he understood those terms, Mercurio stated, "[w]hat I want to avoid, if possible, is our proceeding on the assumption that our current concept satisfies the policy ... when, in fact, there is an established ... policy interpretation to the contrary on this issue." Supp. Ex. 7. Answering his own question, Mercurio stated, "[i]t sounds to me as if there is no firm policy in this regard and we will proceed accordingly." *Id.* There is no suggestion that further communications passed between Mercurio and Battle, and the synagogue has still not been rebuilt.

In its amended complaint, plaintiff suggests that the preceding back and forth between Mercurio and Battle evidences how, "[i]n a transparent effort to avoid paying the [h]old [b]ack," defendant "began making it difficult for [plaintiff] to make reasonable decisions concerning its plans for rebuilding the synagogue by refusing to give the insured any guidance as to whether or not [plaintiff] would be able to count on the ... entire [h]old [b]ack." Am. Compl. ¶ 33.

The next interaction between the parties regarding the building insurance claim appears to have come roughly eighteen months later on August 13, 2008, when Mercurio wrote an email to Jared Stoltz ("Stoltz"), defendant's then counsel. *See id.* at ¶ 40. Mercurio conveyed that as previously discussed at an examination under oath regarding plaintiff's personal property claim, which is discussed below, "although it is considering other options, [plaintiff] is intent on rebuilding its synagogue on its current site," which he explained "has particular significance." Supp. Ex. 8. Explaining that plaintiff's "effort to find a development partner ... has been delayed by several factors, not the least of which is a recent move to change the zoning of the neighborhood to foreclose

certain development projects," Mercurio stated, "[plaintiff] seeks [defendant's] acknowledgment that it is not unduly delaying the reconstruction of the synagogue and is acting reasonably." *Id.* According to plaintiff, Stoltz did not respond to this email, though it appears that further communications between Mercurio and Stoltz regarding the building and/or personal property claims occurred. *See* Am. Compl. ¶ 43; Supp. Ex. 9.

Having been advised by Stoltz shortly after February 11, 2009 that Stoltz was no longer representing defendant, Mercurio wrote a letter on February 18, 2009 to Terry Kravaris ("Kravaris"), an attorney with defendant's present counsel. *See* Am. Compl. ¶ 43. Stating that he had not received a response to his email of August 13, 2008 "concerning the re-building of the synagogue," Mercurio looked forward to hearing from Kravaris once he had familiarized himself with the issue. Supp. Ex. 9.

On March 3, 2009, Kravaris wrote a letter to Mercurio disclaiming further coverage on behalf of defendant for plaintiff's building insurance claim. *See* Am. Compl. ¶¶ 44–47; First Lesser Decl. Ex. H. Citing defendant's prior requests on January 18, 2007 and February 12, 2007 for documentation relating to plaintiff's proposed development plans, Kravaris asserted that "defendant has yet to receive a response to its correspondence" and that "[t]o date, [plaintiff] has failed to provide any information with regard to their intention to rebuild more than three (3) years after the loss." First Lesser Decl. Ex. H 6. Draw-

ing Mercurio's attention to the coverage form's requirement that plaintiff "actually replace and/or repair the property and do so within a reasonable amount of time" prior to becoming entitled to replacement cost coverage, Kravaris again emphasized that three years had elapsed and that "[plaintiff's] dilatory conduct demonstrates unequivocally its failure to make any efforts to rebuild and/or replace the property 'as soon as reasonably possible.' " *Id.* at 6, 7.

### 2. The Personal Property Insurance Claim

On December 18, 2006, plaintiff alleges that it submitted to defendant a claim for certain personal property that it asserted was damaged when the synagogue's roof collapsed roughly eleven months earlier. *See* Am. Compl. ¶ 50.[4] While it is not clear what other documents, if any, may have been provided to defendant in connection with the claim on this date, at least a property inventory numbering twenty-five pages was provided to defendant on this date and possibly via a facsimile sent by Rabbi Gershon Spiegel ("Spiegel"), a representative of plaintiff. *See* First Lesser Decl. Ex. F.[5] The property inventory numbers 145 entries and was written by hand on multiple copies of a standard form evidently created by defendant. *See id.* For each of the entries, plaintiff provided some but not all of the information requested on the standard form. *See id.* While the standard form on which the property inventory appears is entitled "Personal Property Loss Itemization (Supplement to Sworn Statement Proof of Loss)," it is not

---

4. In its moving and reply papers, defendant never suggests that this claim was untimely.

5. The facsimile in question does not reflect the total number of pages that were faxed and the exhibit that was provided to the Court does not include "Page1," which we speculate may have been a cover sheet. While Spiegel

faxed the property inventory on December 18, 2006, what is not apparent is whether he actually provided the document to defendant or perhaps to one of plaintiff's agents who in turn forwarded it. The answer is immaterial. *See* First Lesser Decl. Ex. F.

clear whether such a sworn statement accompanied the property inventory or for that matter was provided before or after the property inventory's submission. *Id.*[6]

On January 19, 2007, John Alt ("Alt"), a claims specialist employed by defendant, wrote a letter to Mercurio, stating that defendant had reviewed plaintiff's property inventory and that "[m]ost of the items lack enough detail for us to verify the replacement cost." First Lesser Decl. Ex. G. *See also* Am. Compl. ¶ 51. By way of example, Alt drew Mercurio's attention to Item No. 61, "organ/piano," for which plaintiff had listed a replacement price of $3,000 to $5,000. First Lesser Decl. Ex. G. Alt explained that "[defendant] will need to resubmit a property inventory with a detailed enough description of the items so that [defendant] may accurately verify the replacement cost." *Id.* He further stated that "the revised inventory must be legible" and that "[s]ome of the hand writing on the current inventory cannot be deciphered." *Id.* In conclusion, Alt requested that plaintiff submit "the detailed, legible contents inventory" within sixty (60) days. *Id.*

There is no dispute that plaintiff failed to provide a response to defendant's request until over a year later on February 8, 2008 when Mercurio wrote an email to Todd Logue ("Logue"), a property claims representative employed by defendant, to which he attached a revised property inventory formatted in a spreadsheet that numbered 136 entries and included photographs of comparable items sourced from the internet. *See* Am. Compl. ¶ 52; Supp. Ex. 10.

On June 11, 2008, Logue wrote a letter to Mercurio in which he stated that "[defendant] is' requesting an [examination under oath] to clarify the facts" of the personal property insurance claim. Supp. Ex. 11. *See also* Am. Compl. ¶ 54. Quoting the entirety of § E(3)(a) and (b), Logue also expressly asserted that "[i]n taking the preceding action, please be advised that [defendant] is doing so under a full and complete reservation of rights." Supp. Ex. 11. On July 23, 2008, defendant accordingly examined Spiegel under oath regarding the personal property insurance claim. *See* Am. Compl. ¶ 53.

As previously discussed, on February 18, 2009, Mercurio wrote a letter to Kravaris in which in addition to requesting clarification of defendant's position on the building insurance claim he also raised the issue that defendant had not responded to plaintiff's personal property insurance claim following the examination under oath. *See id.* at ¶ 56; Supp. Ex. 10. In his aforementioned response on March 3, 2009, Kravaris also disclaimed coverage on behalf of defendant of plaintiff's personal property insurance claim, citing § E(3)(a)(7) of the coverage form and asserting *inter alia* that plaintiff had still failed to provide a sworn proof of loss with the information that defendant had requested on January 19, 2007 and that its time to do so had expired. *See* First Lesser Decl. Ex. H 1, 5. *See also* Am. Compl. ¶ 57.

---

6. Pursuant to § E(3)(a)(7) of the coverage form, plaintiff was required to provide defendant with "a signed, sworn proof of loss." Am. Compl. Ex. A 48. The property inventory, which the parties agree was submitted on December 18, 2006, is signed on each page by a "GS"—presumably Spiegel. Nowhere does defendant challenge the personal property claim on the basis that plaintiff failed to ever submit a signed, sworn proof of loss, focusing instead on plaintiff's alleged failure to timely provide further information at defendant's request. We thus assume compliance with the signed and sworn requirement of the coverage form for the purpose of deciding defendant's motion.

## D. The Pending Action and Motion

On March 3, 2011, plaintiff brought suit against defendant, alleging: (i) a claim for a declaratory judgment that defendant is obligated to pay plaintiff "the full amount of [the r]eplacement [c]ost of rebuilding the synagogue" and the full amount of personal property loss under the policy; and (ii) claims for breach of contract arising from defendant's obligation to pay plaintiff $604,858.16 "on the building *once it is rebuilt*" (the "Replacement Cost Claim") and $217,500 on the lost personal property (the "Personal Property Claim"). Compl. ¶¶ 63, 64, 69, 73 (emphasis added).

On April 25, 2011, defendant filed its motion to dismiss plaintiff's original complaint. On May 23, 2011, plaintiff's counsel requested an extension of time to file plaintiff's opposition papers "[d]ue to unforeseen scheduling issues." Decl. of Renee Simon Lesser in Supp. of Def.'s Mot. to Dismiss Pl.'s Am. Compl. ("Second Lesser Decl.") Ex. B. On June 2, 2011, plaintiff's counsel further requested leave to file an oversize brief in part to accommodate a motion to amend the original complaint. *Id.* at Ex. C. During a telephone conference between the parties and this Court on June 3, 2011, plaintiff's counsel explained that he personally had first learned on May 31, 2011 about the alleged original estimate of the synagogue's replacement cost of which plaintiff, his client, had always been aware. On June 6, 2011, plaintiff's counsel sought leave to amend plaintiff's original complaint "to allege causes of action based on [defendant's] deliberate understatement of the replacement cost," which we granted on June 28, 2011. *Id.* at Exs. F, J.

On July 7, 2011, plaintiff accordingly filed its amended complaint, which added allegations relating to the original estimate and an additional claim for breach of contract arising from defendant's obligation to pay plaintiff "$604,858.16 on the building, which amount should have been paid to [plaintiff] based on [defendant's] original correct [r]eplacement [c]ost estimate" (the "Actual Cash Value Claim"). Am. Compl. ¶ 91. In addition, plaintiff significantly amended its Replacement Cost Claim to remove the conditional phrase "once it is rebuilt." *Compare* Compl. ¶ 69 *with* Am. Compl. ¶ 75. In its reply papers, defendant addressed its motion to dismiss to the additional allegations and claim asserted in the amended complaint. *See* Second Lesser Decl. Ex. I (reflecting defendant's intent).

## III. Discussion

### A. Standard of Review

#### 1. Rule 12(b)(1): Lack of Subject–Matter Jurisdiction

Determining whether subject-matter jurisdiction exists is a threshold inquiry, and a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure must be granted when a district court lacks the constitutional or statutory power to adjudicate a claim. *Morrison v. Nat'l Australia Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008). A plaintiff has the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). We "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," but the requisite "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison,* 547 F.3d at 170 (internal quotation marks and citations omitted). In resolving a motion under Rule 12(b)(1), we may refer to evidence outside the pleadings. *Makarova,* 201 F.3d at 113.

## 2. Rule 12(b)(6): Failure to State a Claim on Which Relief Can Be Granted

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in a plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). Mere "conclusions of law or unwarranted deductions of fact" need not be accepted as true. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994) (internal quotation marks omitted). A complaint must include "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Id.* This pleading standard applies in "all civil actions." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009). In deciding a motion under Rule 12(b)(6), a court may "properly consider matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Halebian v. Berv*, 644 F.3d 122, 130 n. 7 (2d Cir.2011) (internal quotation marks and citations omitted).

### B. The Contractual Time Bar

 Before considering the viability of plaintiff's claims, we must address a threshold question regarding interpretation of the contractual time bar to suit that is incorporated in the policy. In this diversity case, we "apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). The parties predominantly cite to the substantive law of New York, and we agree that it governs. While "an action upon a contractual obligation or liability" must be commenced within six years under the law of New York, N.Y. C.P.L.R. 213(2) (McKinney 2012), it "[i]t is well settled that parties to a contract may agree that a lawsuit must be commenced within a shorter period than that prescribed by law." *Blanar v. State Farm Ins. Cos.*, 34 A.D.3d 1333, 1333, 824 N.Y.S.2d 702 (4th Dep't 2006). *See also Blitman Constr. Corp. v. Ins. Co. of N. Am.*, 66 N.Y.S.2d 820, 823, 498 N.Y.S.2d 349, 489 N.E.2d 236 (1985) ("[p]laintiff does not, as indeed it could not, suggest that the [twelve]-month limitation period of the [insurance] policy is invalid"). In this case, it is not disputed that the policy between plaintiff and defendant provides for a two-year limitation period. The question is whether that limitation period commenced on the date on which the roof of plaintiff's synagogue collapsed or on the, dates on which plaintiff's various causes of action accrued.

In *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88 (2d Cir.2010), the Second Circuit recently addressed this same question. Tracing a series of decisions interpreting the law of New York back to the late nineteenth century, the Second Circuit held that "[t]he phrase 'after the inception of the loss' is regarded, in essence, as a term of art [in an insurance policy] which fixes the limitations period to the date of the accident." *Id.* at 91. "Other generic language, such as [after the date of loss], does not carry this same meaning; instead it ties the limitations period to the moment when a claim accrues." *Id.*

 In this case, the policy's contractual time bar to suit is set out in Commercial Property Conditions § D, which is entitled "Legal Action Against Us" and provides:

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

Am. Compl. Ex. A. 31. Were this provision the only one that we must interpret, we would be presented with a question of whether the phrase "after the date on which the direct physical loss or damage occurred" qualifies as the sort of "exceptionally clear language" that might permit an insurer to fix the commencement of the limitation period to the occurrence of an insured event. *Fabozzi*, 601 F.3d at 91 (discussing seminal case of *Steen v. Niagara Fire Ins. Co.*, 89 N.Y. 315 (1882)). However, this provision in the policy must be read in conjunction with an endorsement to the policy, which is entitled "Legal Action Against Us State Exception Endorsement" and provides:

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

■ THE LEGAL ACTION AGAINST U.S. Condition is amended as follows: The time within which action must be brought against us is:

a. 2 years in the states of Maine, New York, North Carolina, and Virginia.

Am. Compl. Ex. A 66. The parties agree that under the law of New York, "in construing an [e]ndorsement to an insurance policy the [e]ndorsement and policy must be read together and that the policy remains in full force and effect except as altered by the words of the [e]ndorsement." *Thompson–Starrett Co. v. Am. Mut. Liab. Ins. Co.*, 276 N.Y. 266, 270, 11 N.E.2d 905 (1937). Notwithstanding the express statement "THIS ENDORSEMENT CHANGES THE POLICY," defendant argues that the endorsement "does not change or replace the conditions required in order to bring a legal action against [it]." Def.'s Mem. of Law in Supp. of Its Mot. to Dismiss ("Br.") 19. We agree with plaintiff that this interpretation of the endorsement strains credulity.

■ With that said, the endorsement is so ambiguously drafted that it is impossible to definitively say how it was intended to interact with the provision in the policy that it amends and thus to decipher how it was intended to impact the limitation period. "In the absence of other extrinsic evidence as to the parties' intent, it is well-settled law that where an insurer has drafted the policy, as here, 'any ambiguity in [the] ... policy should be resolved in favor of the insured.'" *Fabozzi*, 601 F.3d at 93 (brackets and ellipsis in original) (quoting *McCostis v. Home Ins. Co.*, 31 F.3d 110, 113 (2d Cir.1994)). The parties have not submitted any extrinsic evidence to assist us in interpreting their contract, but the generic language of the endorsement—"[t]he time within which action must be brought against us is ... 2 years"—is of the sort identified in *Fabozzi* as fixing the commencement of the limitation period to the date on which a claim accrues. Accordingly, because we must resolve ambiguities in the policy in favor of the insured under New York law, the timeliness of plaintiff's claims against defendant must be measured from when each of them accrued.

## C. The Actual Cash Value Claim

■ Pursuant to the immediately preceding conclusion, the Actual Cash Value

Claim is barred by the limitation period of the policy. As the Second Circuit observed in *Fabozzi*, "a cause of action for breach of an insurance contract accrues at the time of breach under New York law." *Id.* at 93 (citing *Med. Facilities, Inc. v. Pryke*, 62 N.Y.2d 716, 717, 476 N.Y.S.2d 532, 465 N.E.2d 39 (1984)). "In the context of insurance contracts, 'breach' does not occur until an insured party makes demand upon the insurer and the insurer refuses to pay. It is only when an insurer declines to pay a covered loss for which the insured has requested payment that the insurer has breached the insurance agreement by failing to perform its contractual obligations." *Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*, 866 F.Supp. 143, 145 (S.D.N.Y.1994). Here that breach occurred on November 22, 2006 when, according to plaintiff, defendant failed to pay the actual cash value to which plaintiff was entitled.

■ In its reply papers, plaintiff argues that defendant's breach in connection with the Actual Cash Value Claim occurred when defendant disclaimed any further coverage for the replacement cost of the synagogue on March 3, 2009. *See* Pl.'s Sur–Reply in Further Opp'n to Def.'s Mot. to Dismiss 6. This position is wholly unpersuasive. The disclaimer of March 3, 2009 simply has no bearing on the Actual Cash Value Claim or when it accrued. Following the roof's collapse and the demolition of the synagogue's ruins, on November 22, 2006, defendant paid $605,641.84 to plaintiff, reflecting what defendant asserted was the actual cash value of the synagogue to which plaintiff was entitled pursuant to plaintiff's election under the policy. As plaintiff acknowledges in its amended complaint, opposing papers, and multiple declarations, it was aware on November 22, 2006 that defendant's original estimate of the replacement cost was over three times

greater than the subsequent estimate of the replacement cost on which defendant premised its calculation of the actual cash value. *See* Am. Compl. ¶¶ 27–30; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss ("Opp'n") 8; First Spiegel Decl. ¶¶ 7–11 ("when it came time to issue a check for the ACV, we discovered the amount was based not on [defendant's] original [replacement] cost estimate but on a new 'estimate'"); Second Spiegel Decl. ¶ 3. Now, plaintiff claims that defendant is liable for breach of contract because it in effect refused to pay the much larger amount of actual cash value to which plaintiff was entitled on November 22, 2006. This claim accrued, however, on that same date, November 22, 2006, the only date on which defendant can be understood to have breached its obligation to pay the plaintiff the actual cash value of the synagogue. Thus plaintiff was required to bring this claim on or before November 22, 2008. It is now time barred.

### D. The Replacement Cost Claim

Unlike the Actual Cash Value Claim, the Replacement Cost Claim is not time barred. Its corresponding limitation period did commence with defendant's disclaimer of coverage on March 3, 2009, making the claim, which was originally brought on March 3, 2011, timely, albeit by a day. However, another provision of the policy that preconditions payment of the replacement cost or "hold back" on the actual replacement of the lost or damaged property ultimately forecloses this claim as well.

The parties agree that § E(7)(d)(1) of the coverage form provides that "[defendant] will not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced." Am. Compl. Ex. A 50. There is similarly no dispute that

plaintiff's synagogue has not been rebuilt. Rather, the controversy regarding the Replacement Cost Claim arises over whether defendant can be equitably estopped from asserting this policy limitation as a defense.

■ Under the law of New York, "the elements of estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The party asserting estoppel must show with respect to [itself]: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in [its] position." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir.2005).

■ At the outset of its opposing papers, plaintiff argues that "[w]ith respect to the hold-back, [plaintiff] shows below that (a) the hold-back was improperly retained by [defendant] due to [defendant's] improper manipulations of the value of the building, and (b) that [defendant's] wrongful conduct over the entire course of its dealing with [plaintiff] estops it from asserting the contractual condition precedent." Opp'n 1. We address these separate bases for equitable estoppel in turn.

*First,* defendant's alleged malfeasance in the calculation of the synagogue's estimated replacement cost and actual cash value, which effectively returns us to the premise of the Actual Cash Value Claim, fails as a basis for equitable estoppel because plaintiff was aware of both the original and subsequent estimates at all relevant times. In the absence of any concealment on de-

fendant's part or lack of knowledge on plaintiff's part, equitable estoppel simply does not lie. In November 2006, plaintiff could have sought recourse (i) within the terms of the policy by requesting a neutral appraisal under § E(2) of the coverage form or (ii) outside the terms of the policy by bringing suit for breach of contract. It did neither.[7]

*Second,* defendant's alleged wrongful conduct in the course of its overall dealings with plaintiff is also unavailing. This basis for equitable estoppel essentially reduces to plaintiff's perception that defendant failed to provide it with adequate guidance in January and February 2007 regarding whether one contemplated approach to rebuilding the synagogue together with a developer as part of a mixed-use structure would bar plaintiff from recovering the hold back. *See* Opp'n 13 ("[defendant's] refusal to provide [plaintiff] with guidance is sufficient, on its own, to equitably estop [defendant] from arguing that [plaintiff] did not comply with preconditions of the [p]olicy"). In particular, § E(7)(e) of the coverage form, which provides in relevant part that "[defendant] will not pay more for loss or damage on a replacement cost basis than ... [t]he cost to replace, on the same premises, the lost or damaged property with other property ... [o]f comparable material and quality[ ] and ... [u]sed for the same purpose," Am. Compl. Ex. A 50, appears to have concerned, Mercurio, plaintiff's counsel during the relevant period of December 2006 and January and February 2007. *See* Supp. Exs. 2, 3, 5.

However, in light of the relatively vague information that Mercurio provided to Battle, a senior claims specialist employed by defendant, we do not find that Battle's limited guidance was so improper in con-

---

7. Indeed, we are frankly puzzled by plaintiff's failure to even protest when it received the actual-cash-value payment premised on the

subsequent estimate, let alone pursue more formal remedies.

text that it can be interpreted as a willful effort to frustrate plaintiff's efforts to achieve compliance with the policy's rebuilding requirement. The arguable lack: of specificity in Battle's two pieces of correspondence on January 18, 2007 and February 12, 2007 does not actually seem unreasonable in light of the tentative and limited information that Mercurio acknowledged he was able to provide under the circumstances, nor does Battle's request that plaintiff provide defendant with plans for its proposal appear objectionable.

Moreover, plaintiff's own conduct over the ensuing months significantly bears on how we interpret defendant's conduct. On February 15, 2007, Mercurio responded to Battle's last communication, asserting that it appeared to him that defendant had not established a "firm policy interpretation" that would definitively prevent plaintiff from securing the hold back should plaintiff go forward as it was contemplating and further conveyed that plaintiff would "proceed accordingly." Supp. Ex. 7. According to the amended complaint, Mercurio next engaged a representative of defendant on the issue of rebuilding the synagogue on August 13, 2008, roughly eighteen months after he had conveyed to Battle that plaintiff was moving ahead with a development plan on the assumption that that plan would not *per se* disqualify plaintiff from securing the hold back. *See* Am. Compl. ¶ 40. On this date, Mercurio did not seek further guidance on whether a particular structure would satisfy the rebuilding requirement but rather sought defendant's acknowledgment that plaintiff was not un-

duly delaying the replacement of the synagogue. It is thus not even clear from plaintiff's own allegations how following February 15, 2007 defendant's purportedly deficient guidance frustrated plaintiff's efforts to rebuild the synagogue in any way. As plaintiff acknowledges, it appears instead that a combination of the mounting financial crisis and the City of New York's possible rezoning of the property dealt twin blows to plaintiff's efforts to rebuild. *See* Am. Compl. ¶ 39 (discussing financial crisis); Supp. Ex. 8 (discussing possible rezoning). This cumulative record simply does not support equitably estopping defendant from asserting the policy's rebuilding requirement as a defense.[8]

The precedent that plaintiff brings to our attention in support of its equitable estoppel argument reinforces this conclusion. In the lone case interpreting the law of New York to which plaintiff brings our attention, significantly different facts compelled imposition of the equitable remedy that plaintiff seeks here. In *Zaitchick v. Am., Motorists Ins. Co.*, 554 F.Supp. 209, 216 (S.D.N.Y.1982) (Duffy, J.), *aff'd*, 742 F.2d 1441 (2d Cir.1983), plaintiffs argued that "defendant's refusal to tender [any] payment to them under the contract made replacement of their home and possessions financially impossible." Finding "that both case law and equitable considerations render replacement cost the appropriate method of valuing plaintiffs' damages," the court placed "emphasis on whether cash value has been paid or not." *Id.* at 217. Having examined the applicable terms of the insurance policy, which like those in

---

**8.** To whatever extent that plaintiff can be understood to further rely on defendant's disclaimer of coverage itself as an act of bad faith, we emphasize that this conduct is wholly distinct from the allegations that defendant much earlier frustrated plaintiff's efforts to rebuild by purposefully withholding meaningful guidance on interpreting the policy. *See*

Opp'n 15–16. Further, were the disclaimer of coverage alone able to support an equitable remedy, the seemingly appropriate remedy would be to afford plaintiff additional time to rebuild the synagogue. However, plaintiff has clarified that it claims entitlement to the replacement cost *now*, not once it rebuilds the synagogue. *See* Opp'n 19.

this case provided for payment of actual cash value without prejudice to the subsequent further recovery of the replacement cost, the court stated:

> In other words, insureds can obtain the necessary funds to begin rebuilding their home, and subsequently upon completion of the construction, obtain additional amounts up to the replacement value. In the instant case, plaintiffs were refused any monies under the insurance contract. Not surprisingly, they were unable to replace their home. This conduct by defendant made it impossible for plaintiffs to fulfill the condition precedent, and therefore, excuses plaintiffs from performance of the replacement condition.

*Id.* In this case, however, defendant paid plaintiff $605,641.84 on November 22, 2006, reflecting what defendant asserted was the actual cash value of the synagogue and representing in any event roughly one half of the policy limit of $1,211,000.00. That this payment was insufficient to provide plaintiff with the means to at least begin rebuilding reflects only that plaintiff had recklessly underinsured the synagogue.[9]

Because plaintiff fails as a matter of law to assert a breach of contract claim relating to the hold back, plaintiff's claim that it is entitled to a declaratory judgment stating that defendant must pay it the hold back similarly fails and renders moot the parties' argument over whether subject-matter jurisdiction exists to entertain this latter claim.

**E. The Personal Property Claim**

Like the Replacement Cost Claim, the Personal Property Claim is similarly time-

ly because it accrued with defendant's disclaimer of coverage on March 3, 2009. However, unlike the Replacement Cost Claim, the Personal Property Claim is not barred by any other provision of the policy. Thus, plaintiff's breach-of-contract claim relating to its loss of personal property as well as its derivative request for a declaratory judgment on this issue withstand defendant's motion to dismiss.

In moving to dismiss the Personal Property Claim, defendant relies on § E(3)(a)(7) of the coverage form, pursuant to which plaintiff was in relevant part obliged to "[s]end [defendant] a signed, sworn proof of loss containing the information [defendant] request[s] to investigate the claim ... within 60 days after [that] request." Am. Compl. Ex. A. 48. It is not disputed that plaintiff submitted its original property inventory on December 18, 2006 in support of its personal property insurance claim. It is further not disputed that on January 19, 2007, defendant cited alleged deficiencies in plaintiff's original property inventory in a letter to plaintiff and requested that plaintiff provide additional information within sixty (60) days, nor that plaintiff failed to provide a revised property inventory until February 8, 2008, over one year later. In its moving and reply papers, defendant relies solely on plaintiff's failure to respond with the revised property inventory that defendant requested within sixty (60) days of January 19, 2007. *See* Br. 22–24; Def.'s Reply Mem. of Law in Supp. of Its Mot. to Dismiss 14–15.

9. According to plaintiff's current allegations, the cost to rebuild the synagogue at the time of the roof's collapse was approximate to defendant's alleged original replacement cost estimate of $6,030,568.34. *See* Am. Compl. ¶ 27. As previously noted, in addition to the $605,641.84 that defendant paid plaintiff, defendant also paid an additional $600,000.00 to plaintiff within months of the roof's collapse pursuant to the policy's ordinance and law provisions in order to defray expenses incurred in demolishing the synagogue at the direction of the City of New York.

■ The question that plaintiff poses in response to defendant's argument and that we must answer is whether plaintiff's earlier submission of the original property inventory is sufficient to satisfy its obligation under the policy. "Under New York law, 'failure of the insured to file proof of loss within [the specified time period] is an absolute defense to an action on the policy, absent waiver of the requirement by the insurer or conduct on its part estopping its assertion of the defense.'" *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props., LLC*, 381 F.Supp.2d 250, 259 (S.D.N.Y.2005) (brackets in original) (quoting *Igbara Realty Corp. v. New York Prop. Ins. Underwriting Ass'n*, 63 N.Y.2d 201, 209–10, 481 N.Y.S.2d 60, 470 N.E.2d 858 (1984)).[10] With that said, "New York law does not prescribe a form for proof of loss" and "'[a]s a general rule, notice and proof requirements are liberally construed in favor of the insured.'" *Id.* (quoting *Yaccarino v. St. Paul Fire & Marine Ins. Co.*, 150 A.D.2d 771, 772, 542 N.Y.S.2d 660, 661 (2d Dep't 1989)). "Accordingly, substantial rather than strict compliance with the provisions for proof of loss statements is all that is required." *Id.* (quoting *Yaccarino*, 150 A.D.2d at 772, 542 N.Y.S.2d at 661). "The purpose of a proof of loss 'is that the insurer may be able intelligently to form some estimate of his rights and liabilities before he is obliged to pay.'" *Id.* (quoting *Wachtel v. Equitable Life Assur. Soc. of*

*United States*, 266 N.Y. 345, 352, 194 N.E. 850, 852 (1935)). *See also Harris v. Allstate Ins. Co.*, 83 F.Supp.2d 423, 429–30 (S.D.N.Y.2000) ("'no particular form of proof of loss is required as long as the proof submitted is sufficient to enable the insurer to consider its rights and liabilities'") (quoting *P.S. Auctions, Inc. v. Exch. Mut. Ins. Co.*, 105 A.D.2d 473, 475, 480 N.Y.S.2d 610, 612–13 (3d Dep't 1984)).

■ We have reviewed the original property inventory and conclude that it substantially complies with the requirements of the policy. In originally requesting that plaintiff submit a revised property inventory, defendant explained, "[m]ost of the items lack: enough detail for us to verify the replacement cost." First Lesser Decl. Ex. G. Further, defendant insisted that the revised document be "legible," asserting, "[s]ome of the hand writing on the current inventory cannot be deciphered." *Id.* In its moving papers, defendant stretches this latter complaint, asserting that the handwritten inventory was, "in many instances, even impossible to decipher." Br. 15. Contrary to this litigation position, with perhaps a few exceptions, the original property inventory is plainly legible. *See* First Lesser Decl. Ex. F. Moreover, while plaintiff admittedly failed to complete the columns of the property inventory form supplied by defendant corresponding to each item's useful life and

---

10. On July 23, 2008, defendant examined Rabbi Gershon Spiegel under oath in connection with plaintiff's personal property insurance claim. In its amended complaint, plaintiff asserts, "[w]hatever timeliness defects [defendant] now alleges have certainly been waived by virtue of the July 23, 2008 examination under oath." Am. Compl. ¶ 58. However, in its letter requesting the examination under oath, which followed plaintiff's submission of the revised property inventory, defendant expressly asserted that "[i]n taking the preceding action, please be advised that [defendant] is doing so under a full and com-

plete reservation of rights." Supp. Ex. 11. "Under New York law, waiver of rights under a contract 'should not be lightly presumed.'" *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir.2006) (quoting *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968, 525 N.Y.S.2d 793, 795, 520 N.E.2d 512 (1988). In fact, "'[w]hen an insurer reserves its right to deny coverage, estoppel and waiver may not be inferred.'" *Id.* (quoting *Steadfast Ins. Co. v. Stroock & Stroock & Lavan LLP*, 277 F.Supp.2d 245, 254 (S.D.N.Y. 2003)).

place of purchase, plaintiff did provide for each item its age in years and a per item replacement price. *Id.* Though in a number of cases, plaintiff provided a range for the number of items and/or their replacement price, even a calculation of plaintiff's personal property insurance claim premised on the minima in all of these ranges yields an aggregate replacement cost slightly in excess of $250,000.00, which we note is well above the applicable policy limit of $218,100.00, though obviously this figure does not reflect the actual cash value of the personal property.[11] Because the descriptions provided in the property inventory, while often not fulsome, were nonetheless adequate together with the information regarding each item's age and estimated replacement price to permit defendant to begin intelligently considering its rights and liabilities regarding the personal property insurance claim, plaintiff did not fail to satisfy its obligation under S E(3)(A)(7) of the coverage form.

## IV. Conclusion

For the reasons stated above, defendant's motion is granted in part and denied in part. The parties are directed to appear for a conference on April 12, 2012 at 3:00 p.m. in Courtroom 21A.

---

11. Like the synagogue, plaintiff's personal property was insured on a replacement cost basis with the same available option of requesting payment for the actual cash value of any damaged or lost property pending its replacement. *See* Am. Compl. Ex. A 18, 50.